| | |
|---|---|
| Anthony Markel,<br><br>   Plaintiff,<br><br>v.<br><br>Douglas Technologies Group, Inc., *a California corporation, d/b/a Douglas Wheel Technologies*,<br><br>   Defendant. | Case No. 17-cv-1790 (SRN/LIB)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Brian D. Stofferahn, Gregory N. Bittle, and Keith J. Kerfeld, Tewksbury & Kerfeld, P.A., 88 South Tenth Street, Suite 300, Minneapolis, MN 55403 for Plaintiff.

Kyle A. Eidsness and Russell S. Ponessa, Hinshaw & Culbertson LLP, 333 South Seventh Street, Suite 2000, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

  This case is about a wheel manufactured by Defendant Douglas Technologies Group ("DWT"), and whether an alleged defect in that wheel caused Plaintiff Anthony Markel's all-terrain vehicle ("ATV") to crash during an ATV race on June 16, 2013. DWT now moves for summary judgment as to all of the claims Markel has asserted against it. In so doing, DWT primarily argues that Markel's liability expert, Mr. Christopher Brand, failed to provide the requisite expert opinions needed to advance a products liability claim past summary judgment. In response, Markel contends that Mr. Brand's expert testimony sufficiently raises disputes of material fact, and that, to the extent Mr. Brand's analysis is lacking, this case does

not require expert opinion. The parties also dispute whether Markel's related "failure to warn" claims should survive summary judgment.

Because the Court agrees with DWT in all relevant respects, it will grant its summary judgment motion in full.

## I. BACKGROUND

### A. The Parties

Plaintiff Anthony Markel (hereinafter "Markel") lives in Harris, Minnesota (*see* Compl. [Doc. No. 1] ¶ 1), and was, at the time of this accident, an amateur ATV racer who had raced in "100 to 200 races." (*See* Markel Dep. [Doc. No. 42] at 174.)

Defendant Douglas Technologies Group, Inc., d/b/a Douglas Wheel Technologies (hereinafter "DWT"), is a California Corporation with its principal place of business in Vista, California. (*See* Compl. ¶ 2; An. [Doc. No. 8] ¶ 2.) DWT has been manufacturing ATV wheels since the early 1990s. (*See* Leibelt Dep. [Doc. No. 45-2] at 21.) One of DWT's products is an aluminum "Sport Blue Label" wheel, which is apparently meant for "recreational" ATV use. (*See id.* at 38-41.)

### B. The Accident

At some point in 2010, Markel purchased an eight-year-old Sport Blue Label wheel for his "2004 Honda TRX ATV." (*See* Brand Supp. Ex. Rep. [Doc. No. 42] at 2 (when Markel purchased the wheel); ESI Ex. Rep. [Doc. No. 42] at 7-8 (age of wheel); *id.* at 5 (brand of ATV).) Although new Blue Label wheels come with a separate "recommended usage chart" stating that the wheels are not meant for racing (*see* Brand Ex. Rep. [Doc. No. 42] at 6-7; ESI Ex. Rep. at 6; *see also* 2009 DWT Catalogue [Doc. No. 45-5] (stating that "Blue Label"

wheels are meant for "recreation," in comparison to the "Red Label" "racing" wheels)), Markel claims not to have seen that warning, or "recommended usage chart," when he purchased his Blue Label wheel. (*See* ESI Ex. Rep. at 2-3.)

In any event, three years (and an unclear number of races) later, on June 16, 2013, the "rim" of the at-issue wheel came undone while Markel was in the final lap of an ATV race in Ogilvie, Minnesota. (*See* Brand Ex. Rep. at 2; ESI Ex. Rep. at 2-3.) Markel's ATV then rolled over and crashed, and Markel was flung from his vehicle into a nearby wall. (*Id.*) This collision severely injured Markel. (*Id.*; *see also* Pl.'s Statement of the Case [Doc. No. 12] at 2 (listing Markel's various medical expenses).)

### C. Litigation and Procedural History

On May 30, 2017, Markel filed the present complaint, asserting claims of (1) products liability, (2) failure to warn, (3) breach of warranty, (4) negligence, and (5) post-sale duty to warn, all related to DWT's manufacture and sale of the broken Sport Blue Label wheel rim. DWT answered a little less than a month later, and asserted numerous affirmative defenses. (*See* Answer [Doc. No. 8].) In June 2018, after Markel's counsel inadvertently missed the deadline to file expert witness disclosures, Markel moved for, and received, a four-month extension of the discovery period. (*See* Mag. Judge's Aug. 10, 2018 Order [Doc. No. 34].) At the end of the discovery period, on December 14, 2018, DWT filed its motion for summary judgment. The parties filed briefs in support of and in opposition to the motion, and the Court heard oral argument on January 25, 2019. (*See* Def.'s Br. in Supp. of Summ. J. [Doc. No. 39] ("DWT Br."); Pl.'s Br. in Opp. to Summ. J. [Doc. No. 41] ("Markel Br."); Def.'s Reply Br. [Doc. No. 47] ("DWT Reply Br.").)

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In considering a summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party." *Grinell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012). However, a party opposing summary judgment "'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57).

### A. The Products Liability Claim

Because Markel's "products liability," "breach of warranty," and "negligence" claims are best classified as a single "products liability claim," the Court will address the three claims as such. *See Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (noting that, under Minnesota law, "strict liability, negligence, and implied warranty remedies" have all "merged" "into a single products liability theory"); *accord In re Shigellosis Litig.*, 647 N.W.2d 1, 11 (Minn. Ct. App. 2002); *Hammes v. Yamaha Motor Corp.*, No. 03-cv-6456 (MJD/JSM), 2006 WL 1195907, at *13 (D. Minn. May 4, 2006).

#### 1. The Law

To establish a *prima facie* case of products liability under Minnesota law, an injured plaintiff bears the burden of proving the following three elements:

1. The product was in a defective condition unreasonably dangerous for its intended use;

2. The defect existed when the product left the defendant's control; and

3. The defect was the proximate cause of the injury sustained.

*Bilotta v. Kelley*, 346 N.W.2d 616, 623 n.3 (Minn. 1984) (citing *Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W.2d 426, 432 (Minn. 1971)). If a plaintiff fails to introduce affirmative evidence in support of any one of these elements, a defendant is entitled to summary judgment. *See Lloyd v. In Home Health, Inc.*, 523 N.W.2d 2, 3 (Minn. Ct. App. 1994) (affirming grant of summary judgment as "mandatory" against party who failed to establish an essential element of a cause of action).

With respect to the first element – the existence of an "unreasonably dangerous" defect – a plaintiff must submit evidence showing that a defendant failed "to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Bilotta*, 346 N.W.2d at 621 (citing *Holm v. Sponco*, 324 N.W.2d 207, 212 (Minn. 1982)). This "reasonable-care balancing test" "is an objective standard 'which focuses on the conduct of the manufacturer in evaluating whether its choice of design struck an acceptable balance among several competing factors.'" *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1009 (8th Cir. 1998) (quoting *Bilotta*, 346 N.W.2d at 622).

When "the standard of care" that a manufacturer "must exercise" in weighing the costs and benefits of an alleged "design defect" is "not within the general knowledge and experience of lay people," "expert testimony is necessary." *Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1128 (D. Minn. 1998) ("the workings of pacemakers and pacemaker

leads, as well as the reasons why they fail to perform," required expert testimony); *see also Holverson v. ThyssenKrupp Elevator Corp.*, No. 12-cv-2765 (ADM/FLN), 2014 WL 3573630, at *4 (D. Minn. July 18, 2014) ("the design of the electric and mechanical systems allowing an elevator to function" required expert testimony). Moreover, even if an expert does comment on purported "defects" or "anomalies" in a defendant's product, that expert's testimony does not suffice to survive a summary judgment motion unless the expert explains *why* the "defects" constituted an "unreasonably dangerous condition" under Minnesota's reasonable-care balancing test. *Western Sur. and Cas. Co. v. Gen. Elec. Co.*, 433 N.W.2d 444, 448 (Minn. Ct. App. 1988) (granting defendant summary judgment in case involving an exploding car headlight because, although plaintiff's expert identified certain "anomalies" with the headlight, he did not "testify that any of the light's anomalies or defects was an unreasonably defective condition"); *see also Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1160-61 (D. Minn. 2011) (granting defendant summary judgment on design-defect claim because plaintiff's expert "offered no testimony on the nature—let alone the burden—of the precaution which would be effective to avoid the harm of the [at-issue] catheter's allegedly defective design"). This "expert witness rule" exists to prevent a jury from being "forced to speculate in determining whether [an injured plaintiff] has proven the requisite elements on [their] defect claims." *Mozes*, 14 F. Supp. 2d at 1128 (citing *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985)).

With respect to the third element – causation – a plaintiff must submit evidence showing that "the defendant's conduct, without intervening or superseding events, was a

substantial factor in creating the harm" that injured the plaintiff. *Thompson v. Hirano Tecseed Co., Ltd.*, 456 F.3d 805, 812 (8th Cir. 2006). However, as with a design defect, "when the causal relation issue is not within the common knowledge [of a lay person] causation in fact cannot be determined without expert testimony." *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 639 (8th Cir. 1971) (expert testimony required to determine whether doctor's alleged misuse of a heart catheter caused a blood clot "to develop in [the plaintiff's] common iliac artery"); *accord Lindsay v. St. Olaf College*, No. A-06-2461, 2008 WL 223661, at *3-4 (Minn. Ct. App. Jan. 28, 2009) (expert testimony required to determine whether alleged defects in a chemical "fume hood" caused plaintiff to suffer "enhanced [burning] injuries"); *Kapps*, 813 F. Supp. 2d at 1154 (expert testimony required to determine whether a catheter's failure during a medical proceeding was "causally connected to" the alleged defect identified by plaintiff's expert witness).[1]

### 2. Analysis

The Court finds that summary judgment in favor of DWT is warranted here, for two independent reasons.

***First***, although Markel argues (without any citations to the record) that his expert witness, Mr. Christopher Brand,[2] can testify that "the design" of DWT's Sport Blue Label

---

[1] Because neither party discusses the second element of a products liability claim in their briefing, the Court will not address that element either.

[2] Technically Mr. Brand's expert report was signed by another engineering expert named Jeffrey Pfaendter. However, because Dr. Pfaendter only cursorily participated in this process as a "reviewer," and because Dr. Pfaendter does not offer any opinions unique from those of Mr. Brand, the Court will generally refer to Mr. Brand as Markel's

7

wheel was "defective for flat track [ATV] racing," and that "alternative designs were feasible" (Markel Br. at 7-8), the Court finds that that is not the case. At best, Mr. Brand could testify to the following: (a) "the distance from the bolt holes to the inner diameter edge [of DWT's Sport Blue Label wheel rim] is not within generally accepted mechanical design guidelines," (b) this design created a "potential" for the wheel rim to "tear out," and (c) "designing [an ATV wheel] rim in a manner consistent with [generally accepted mechanical design] guidelines is feasible." (Brand Ex. Rep. at 12.) However, at no point in his expert report does Mr. Brand opine that the distance from the "bolt holes to the inner diameter edge" on the Blue Label wheel constituted an "unreasonably dangerous condition" with respect to a foreseeable use of the wheel, *i.e.*, ATV racing. *See Western Sur. and Cas. Co.*, 433 N.W.2d at 448 (granting defendant summary judgment where plaintiff's expert failed to opine that an "anomaly" in the defendant's headlight amounted to an "unreasonably dangerous condition" under Minnesota products liability law, and noting that, because the expert did not do so, "any such conclusion by the jury would have been pure speculation"). Nor does Mr. Brand attempt to apply the "reasonable-care balancing framework" employed by Minnesota courts; he simply asserts that one aspect of the wheel is not in accordance with certain design guidelines, and that therefore the entire product must be "defective" for ATV racing. *See Trost*, 162 F.3d at 1009 (granting summary judgment to manufacturer of a supposedly defective "all-terrain bicycle" because plaintiff's expert witness "produced no

---

sole liability expert. (*See* Brand Dep. [Doc. No. 42] at 157-58 (testifying that Dr. Pfaendter's review consisted of "minor edits" that were "mostly" "clerical" in nature).)

information upon which to evaluate the likelihood of harm, the expected gravity of harm, or what precautions could have avoided the harm").

Further, to the extent Mr. Brand's expert report left any confusion as to the scope of his proposed testimony, at his deposition he clarified (without any objection from Markel's counsel) that his report did "not set forth an opinion to a reasonable degree of engineering certainty that the subject DWT Blue wheel has a design defect that makes it an unreasonably dangerous product." (Brand Dep. at 16-17.) One indicative exchange went as follows:

> **Q:** As you sit here today, Mr. Brand, do you feel you have the necessary foundation to have reached an opinion to a reasonable degree of engineering certainty regarding whether the subject Blue Label DWT wheel, has a design defect that makes it . . . an unreasonably dangerous product?
>
> **A:** Okay. Can I have that repeated, please?
>
> [*Court reporter repeats the question*]
>
> **A:** No.
>
> (*Id*. at 20-21.)

As such, because expert engineering testimony is indisputably necessary for a jury to find that the at-issue wheel contained an "unreasonably dangerous" defect, *see Mozes*, 14 F. Supp. 2d at 1128, and because Markel has failed to secure competent expert testimony stating anything to that effect, the Court must grant summary judgment in favor of DWT on Markel's "products liability" claim.

*Second*, however, even if Mr. Brand's testimony could somehow be construed as a properly-supported expert opinion as to "design defect," Mr. Brand's report and deposition testimony demonstrate that he cannot offer an expert opinion as to causation either. Again, at

9

best, Mr. Brand could testify that the distance between the wheel's "bolt holes" and "inner diameter edge" created a "potential for tear out," and that "tear out" "is consistent with" how DWT's wheel failed in this case. (Brand Ex. Rep. at 12.) However, Mr. Brand simply does not discuss "proximate cause" in his report, and, to the extent he touches on issues of "proximate cause" in his supplemental report (in response to the reports written by DWT's two expert witnesses), Mr. Brand fails to affirmatively connect his "bolt nuts" theory to an ultimate conclusion. (*See, e.g.*, Brand Supp. Ex. Rep. at 3 (suggesting that "all major damage to the rim can most likely be attributed to the accident," as opposed to pre-accident wear and tear, but not then opining that the distance from the "bolt holes" to the wheel's "inner diameter edge" *proximately caused* "the accident").) Indeed, at his deposition, Mr. Brand not only testified that his report did not contain an opinion as to causation, and that he lacked the foundation to offer such an opinion (*see generally* Brand Dep. at 14-20), but he also testified that he "did not know" the answer to several critical causation questions, largely centering around other potential causes of the wheel's failure. (*See, e.g.*, *id.* at 23 ("**Q:** What was the stress or load that caused the tear-out failure? **A:** I don't know."); *id.* at 32 ("**Q:** Where did the cracks that, in your opinion to a reasonable degree of engineering certainty, caused the wheel to fail, originate? **A:** I don't know."); *id.* at 37 ("**Q:** Was there damage to the . . . subject ATV wheel before the race in which Mr. [Markel] had his accident? **A:** I don't know.").)

To paraphrase a prior, on-point opinion by Judge Schiltz of this Court: "[f]or all [Mr. Brand] knows—and for all a jury could know based on his testimony—the [supposedly improper distance between the bolt holes and the wheel's inner diameter edge] could have been a purely cosmetic defect with no relation to the [wheel's final failure]." *Kapps*, 813 F.

Supp. 2d at 1154. "Nothing but speculation connects the [alleged defect with the wheel's bolt holes] to the failure of [the wheel], and speculation is insufficient to support a jury verdict against" DWT on Markel's design-defect claim. *Id.*

Markel's only notable argument to the contrary is that expert testimony as to "causation" is not needed here because "wheels have been around for years and lay people are aware of their many uses." (Markel Br. at 8.) For instance, Markel observes, "if [one's] wheel came apart and fell off their car, one would not need an expert witness to tell them that the wheel was faulty." (*Id.* at 8-9.) This argument misses the mark. Although it may be obvious to a lay person that a wheel *should not* spontaneously fall off a vehicle while one is driving it, the average lay person would nonetheless need an engineering expert to educate them as to *why* the wheel fell off the vehicle, and whether that mechanical failure related to an "unreasonably dangerous" defect in the wheel's design, or to something else. After all, as is axiomatic in products liability law, "the mere fact of injury during use of a product usually is insufficient proof to show existence of a defect" with the product. *Lee*, 290 Minn. at 329; *see also Trost*, 162 F.3d at 1009 (noting that "in Minnesota *res ipsa loquitur* alone cannot make out a products liability case," and that a plaintiff must therefore "introduce something more" than the unadorned argument that "the accident would not have happened if the [product] had not been defective").

For all of these reasons, the Court grants DWT summary judgment with respect to Markel's "products liability" claim.

## B. The Failure to Warn Claims

The Court will now address Markel's final two, non-products-liability claims: "failure to warn" and "post-sale failure to warn." *See Huber v. Niagra Mach. and Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988) (noting that "failure to warn is a cause of action separate from defective design").

### 1. The Law

"To prevail on a warning-defect claim under Minnesota law, a plaintiff must establish three things: (1) the defendant had a duty to warn; (2) the defendant breached that duty by providing an inadequate warning (or no warning at all); (3) the defendant's inadequate (or nonexistent) warning caused the plaintiff's damages." *Kapps*, 813 F. Supp. 2d at 1155 (citing *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987)).

The first element – duty to warn – is determined by the Court as a matter of law, and hinges upon an evidentiary showing that "the plaintiff's injuries were a direct consequence and the type of occurrence that was or should have been reasonably foreseeable, given the defective condition of the [at-issue product]." *Seefeld v. Crown, Cork & Seal Co., Inc.*, 779 F. Supp. 461, 464 (D. Minn. 1991) (citing *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922 (Minn. 1986)). In other words, for a defendant to have a duty a warn, it "must have had 'reason to know of the dangers of using the product.'" *Green Plains Otter Tail, LLC v. Pro-Environmental, Inc.*, 349 F. Supp. 3d 768, 778 (D. Minn. 2018) (quoting *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 924 (8th Cir. 2004)); *see, e.g.*, *Donovan v. Bioject, Inc.*, No. C8-00-1112, 2001 WL 243096, at *2 (Minn. Ct. App. Mar. 13, 2001) (granting defendant summary judgment on failure to warn claim because plaintiff "failed to present admissible evidence showing that other individuals suffered injuries similar to [plaintiff's] as a result of

[using the product] or any other evidence that the type of injury suffered by [plaintiff] was a foreseeable risk of [using the product]"). Further, if a plaintiff "has not demonstrated that a dangerous condition existed in the [product] at issue," a plaintiff cannot then show that an injury arising out of that "defective" product "was reasonably foreseeable" by the defendant, such that they had a duty to warn of the defect. *Holverson*, 2014 WL 3573630, at *5 (granting defendant summary judgment on duty to warm claim, in large part because plaintiff failed to show an "unreasonably dangerous" defect with respect to his "products liability claim").

In addition, although the latter two elements of a "failure to warn" claim are generally considered fact questions best left for a jury to resolve – adequacy of the warning and causation – courts will nonetheless resolve them at summary judgment when the record contains no admissible evidence in support of a jury finding for the plaintiff on that element. *See, e.g.*, *Tuttle*, 377 F.3d at 924 (finding causation as a matter of law because the plaintiff failed to submit "affirmative evidence [that they] would have refrained from using [the at-issue product] had the defendants provided adequate product warnings"); *Lindsay*, 2008 WL 223661, at *5 (same).

Finally, Minnesota courts also recognize a cause of action for "post-sale failure to warn," that is, where "a manufacturer discovers a hidden defect *after* the time of sale" and then fails to warn customers of this defect. *Great N. Ins. Co. v. Honeywell Int'l, Inc.*, 911 N.W.2d 510, 519 (Minn. 2018) (citing *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn. 1988)). However, this cause of action only applies in "special cases," such as where a company learns that a "hidden defect" in its product is unexpectedly

13

injuring customers, and yet fails to undertake any effort to warn "known customers," after the fact, of this potential defect. *Id*.

### 2. Analysis

The thrust of Markel's "failure to warn" claims appears to be that, because DWT knew, or should have known, that its Sport Blue Label wheel was "unreasonably dangerous" for ATV racing (as evidenced by its own warnings), DWT should have placed a "permanent marking" or "engraving" on the wheel stating that the wheel was "not meant for racing." (*See* Markel Br. at 8 (citing Brand Ex. Rep. at 10-12).) According to Mr. Brand, the warnings DWT currently appends to its Blue Label wheels, or otherwise sets forth in its advertisements, are inadequate. (*See* Brand Ex. Rep. at 10; *see also supra* at 2-3 (describing DWT's current warning labels).)

Although Markel's "failure to warn" claim is somewhat different from his products liability claim, in that it focuses on DWT's (arguably broader) duty to warn against "racing" with the Blue Label wheel, as opposed to the (arguably narrower) "bolt holes" defect discussed *supra*, the Court nonetheless finds that summary judgment is warranted in favor of DWT on this issue, too. This is so for two reasons.

First, despite the fact that DWT did (and still does) warn customers against racing with its Blue Label wheels, the record contains no affirmative evidence (much less expert testimony) from which the Court could conclude that, in this case, DWT was under a *legal duty* to issue such a warning. As the Court discussed above, there is no evidence that the allegedly "defective" aspect of the wheel, *i.e.*, the distance between the wheel's "bolt holes" and "inner diameter edge," rendered the wheel "unreasonably dangerous" for ATV racing.

14

(*See supra* at 8-9.) Consequently, the Court is hard pressed to find that DWT "had reason to know" that the Blue Label wheel was so "dangerous" that it needed to warn its customers about it as a *matter of law*, as opposed to as a matter of cautious business practice. *Green Plains*, 349 F. Supp. 3d at 778; *accord Holverson*, 2014 WL 3573630, at *5. Indeed, at his deposition, DWT's corporate deponent confirmed that, despite the company's warnings against using Blue Label wheels for ATV racing, DWT does not actually consider the product "unreasonably dangerous" for that purpose. (*See* Leibelt Dep. at 58 (testifying that, although the Blue Label wheel "was not designed for racing purposes," the company does not "consider it dangerous to use the Sport Blue for racing").) More still, the fact that DWT has not faced any other "claim, report, or lawsuit in which a person alleged they were injured as a result of any alleged defect in the subject model Sport Blue wheel rim specifically, or for any other wheel rim in the same model series, or that would be compatible with [Markel's] 2004 Honda ATV" (Def.'s Answers to Pl.'s Interrogatories [Doc. No. 42] at 17), provides further evidence that DWT did not know that "the type of injury suffered by [Markel] was a foreseeable risk of [using the Blue Label wheel]." *Donovan*, 2001 WL 243096, at *2. As such, because there is no evidence that DWT *needed* to provide a warning against using the Blue Label wheel for "racing," much less the kind of "permanent engraving" suggested by Markel, the Court must grant summary judgment in favor of DWT on Markel's "failure to warn" claim.

Second, however, even if DWT was under a legal duty to warn its customers against using the Blue Label wheel for racing, *and* even if its "recommended usage chart" was inadequate (because a customer like Markel might not see it if they bought the wheel on the secondary market), Markel has submitted no evidence showing that a lack of a permanent

15

"not for racing" engraving caused his injury here. For one, as detailed above, there is no evidence that a defect with the Blue Label wheel actually caused Markel's crash. (*See supra* at 10-11.) Furthermore, there is no affirmative, admissible evidence that Markel, an experienced ATV racer, "would have refrained from using" the Blue Label wheel on June 16, 2013 (a wheel which, by that point, he had owned for three years), had DWT "provided adequate product warnings" against racing with the wheel. *Tuttle*, 377 F.3d at 924. To the contrary, DWT's expert report highlights that "[t]here is no evidence that any additional labeling would have impacted any decisions made by Anthony Markel so as to have prevented this crash event." (ESI Ex. Rep. at 11; *cf.* Brand Dep. at 16 (testifying that his expert report did *not* "set forth an opinion to a reasonable degree of engineering certainty that a direct cause of [Markel's] ATV racing accident was that there was no explicit warning permanently affixed to the [DWT] wheel").) The Court has scoured the record in search of any admissible evidence suggesting otherwise (because Markel did not provide any record citations related to this issue in his brief), and has come up empty.[3] As such, because "the undisputed facts demonstrate a lack of causation between the failure to warn and the

---

[3] Admittedly, during the deposition of DWT's 30(b)(6) witness, Markel's counsel referenced *Markel's own* deposition testimony, in which Markel supposedly stated that "if he knew that the Blue Labels were not intended for racing, he would not have used them for racing." (Leibelt Dep. at 118.) However, because that statement is unreliable hearsay, and because Markel's counsel did not submit *any* potentially favorable portion of Markel's deposition transcript with its opposition motion, much less that particular segment of testimony, the Court cannot consider that passing reference to Markel's testimony as "evidence of proximate cause." *Cf. Tuttle*, 377 F.3d at 924 (declining to consider a plaintiff's "unsworn, out-of-court statement" that she "wouldn't have used the product if she'd been warned about using it" as "evidence of proximate cause").

injury sustained," the Court grants DWT summary judgment on Markel's "failure to warn" claim for this reason, too. *Id*. (citing *Balder*, 399 N.W.2d at 81).

Finally, because this case is plainly not the kind of "special case" in which DWT would have a "post-sale duty to warn," *Great N. Ins. Co.*, 911 N.W.2d at 519, and because Markel makes no argument suggesting otherwise, the Court also grants DWT summary judgment on Markel's "post-sale failure to warn" claim.

For all of these reasons, the Court grants DWT summary judgment with respect to both of Markel's "failure to warn" claims.

## III. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant DWT's Motion for Summary Judgement [Doc. No. 39] is **GRANTED**, and Plaintiff Markel's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: April 1, 2019                             s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge